**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HELEN L. PALKO, | : | |
| | : | |
| Plaintiffs, | : | **C.A. No.: 1:06-CV-109** |
| | : | |
| V. | : | |
| | : | |
| GORDON PEPPER and KATHLEEN | : | |
| PEPPER, | : | |
| | : | |
| Defendants. | : | |

**MOTION TO AMEND COMPLAINT**

Plaintiff, Helen L. Palko, by and through her attorneys, hereby respectfully requests this Honorable Court enter an Order permitting plaintiff leave to file an Amended Complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to assert an additional count for punitive damages. In support of her Motion, plaintiff states:

1.    This is a personal injury action arising out of a motor vehicle accident that took place on April 12, 2004.

2.    On February 17, 2006, plaintiff filed a complaint in the United States District Court for the District of Delaware against the defendants, Gordon Pepper and Kathleen Pepper.

3.    The Trial Scheduling Order provides that Motions to Amend the Pleadings must be filed by July 3, 2006.

4.    Plaintiff seeks an order from the Court permitting her to amend the Complaint to add a claim for punitive damages against the defendants, Gordon Pepper and Kathleen Pepper. (Proposed Amended Complaint attached as Exhibit "A").

5.    The additional allegations against the defendants, Gordon Pepper and Kathleen Pepper arose from the April 12, 2004 motor vehicle accident and should therefore be litigated together with the plaintiff's initial action.

6.    The basis for the additional allegations stem from the deposition testimony of Kathleen Pepper wherein Kathleen Pepper testified that she had consumed alcohol in the 24 hour period before this accident (Tr. p. 17) and the last alcoholic beverage she had was between 4:00 and 4:30 a.m. on April 12, 2004 (Tr. p. 21). Mrs. Pepper testified that she was taking a significant amount of prescription medications that she took the morning of April 12, 2004 of which she was not able to recall reading or receiving any warnings as to the side effects of those prescriptions mixed with alcohol (Tr. pp. 22-30). Furthermore, Mrs. Pepper testified that her counselor was aware she had consumed alcohol and administered a breathalyzer test and informed Mrs. Pepper that if she left the building, the police would be called (Tr. p. 36). Regardless of the statements made by her counselor, Mrs. Pepper left the building and testified she felt capable of operating her vehicle (Tr. pp. 36-38). Mrs. Pepper was subsequently charged with and pled guilty to Driving Under the Influence (Tr. pp. 16-17). Transcript is attached as Exhibit "B".

7.    It is plaintiff's contention that such outrageous conduct demonstrates a reckless indifference to risks that were known or should have been known and warrants punitive damages. See Jardel Co., Inc. v. Hughes, Del. Supr., 523 A.2d 518, 531, 532 (1987).

8.    Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Leave should be freely granted unless there is an apparent or declared reason for denial, e.g., undue delay, bad faith, or dilatory motive on the part of the movant; undue prejudice to the opposing party; or futility of the amendment. Isco Int'l., Inc. v. Conductus, Inc., 2002 U.S. Dist. LEXIS 21706, *3 (D. Del. 2002). Absent such grounds for denial, "it is an abuse of discretion for a district court to deny leave to amend." Id. The purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on the merits rather than on procedural technicalities. In re Marvel Entertainment Group, Inc., 273 B.R. 58, *81 (D. Del. 2002). Fed. R. Civ. P. 15(c) allows an amendment to a pleading to relate back to the date of the original pleading.

WHEREFORE, plaintiff prays that this Court enter an Order granting the plaintiff's Motion to Amend the Complaint to add a claim for punitive damages against the defendants, Gordon Pepper and Kathleen Pepper.

DOROSHOW, PASQUALE,
KRAWITZ & BHAYA

By:     /s/ MATTHEW R. FOGG
ARTHUR M. KRAWITZ (I.D. NO.:  2440)
MATTHEW R. FOGG (I.D. NO.:  4254)
1202 Kirkwood Highway
Wilmington, DE   19805
(302) 998-0100
Attorneys for Plaintiff
ArthurKrawitz@dplaw.com
MattFogg@dplaw.com

DATED: 7-3-2006

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

HELEN L. PALKO,                                :
                                               :
      Plaintiffs,                      :        **C.A. No.: 1:06-CV-109**
                                               :
V.                                             :
                                               :
GORDON PEPPER and KATHLEEN                     :
PEPPER,                                        :
                                               :
      Defendants.                      :

## <u>ORDER</u>

AND NOW, this _____ day of _____ 2006, the Court having heard and considered Plaintiff's Motion to Amend Complaint:

IT IS HEREBY ORDERED that plaintiff's Motion be GRANTED.  Plaintiff is granted leave of the court to amend the Complaint to add a punitive damages claim against the defendants, Gordon Pepper and Kathleen Pepper.

_____
Judge

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HELEN L. PALKO, | : | |
| | : | |
| Plaintiffs, | : | **C.A. No.: 1:06-CV-109** |
| | : | |
| V. | : | |
| | : | |
| GORDON PEPPER and KATHLEEN PEPPER, | : | |
| | : | |
| Defendants. | : | |

### CERTIFICATE OF SERVICE

I, MATTHEW R. FOGG, ESQUIRE, hereby certify that I have this 3rd day of July, 2006, mailed, two (2) true and correct copies of the following document(s) addressed to the person(s) listed below:

DOCUMENT:

Motion to Amend Complaint

PERSON (S):

David A. Denham, Esq.
Bifferato, Gentilotti, Biden & Balick
1308 Delaware Avenue
P.O. Box 2165
Wilmington, Delaware 19899

DOROSHOW, PASQUALE,
KRAWITZ & BHAYA

By:    /s/ MATTHEW R. FOGG
ARTHUR M. KRAWITZ (I.D. NO.: 2440)
MATTHEW R. FOGG (I.D. NO.: 4254)
1202 Kirkwood Highway
Wilmington, DE   19805
(302) 998-0100
Attorneys for Plaintiff
ArthurKrawitz@dplaw.com
MattFogg@dplaw.com

DATED: 7-3-2006

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HELEN L. PALKO, | : | |
| | : | |
| Plaintiffs, | : | **C.A. No.: 06-109 KAJ** |
| | : | |
| V. | : | |
| | : | |
| GORDON PEPPER and KATHLEEN | : | |
| PEPPER, | : | |
| | : | |
| Defendants. | : | |

## AMENDED COMPLAINT

### PARTIES

1.  Plaintiff, Helen Palko, is an individual who resides at 1733 Windsor Avenue, Lancaster, Pennsylvania 17601.

2.  The defendants, Gordon Pepper and Kathleen Pepper, are husband and wife who reside at 45 Clendaniel Avenue, Selbyville, Delaware 19971.

### JURISDICTION

3.  Paragraphs 1 through 2 are incorporated herein by reference.

4.  Jurisdiction is conferred pursuant to 28 U.S.C. §1332(a)(1) and 28 U.S.C. §1332(c)(1) as the amount in controversy exceeds $75,000.00 and the action is between citizens of different States.  Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), as this is the judicial district where the act complained of occurred.

### FACTUAL ALLEGATIONS

5.  Paragraphs 1 through 4 are incorporated herein by reference.

6.      On or about April 12, 2004, at approximately 9:00 a.m., the plaintiff, Helen Palko, was operating her vehicle in the left hand lane of northbound Delaware Route 113 near the intersection of Gov. Stockley Road, in Georgetown.

7.      At the aforementioned time and place, Lynn Farren was operating her vehicle in the right hand lane of northbound Delaware Route 113, directly behind a motorcycle operated by Paul R. Farren, when the defendant, Kathleen Pepper, operating a vehicle owned by the defendant, Gordon Pepper, while under the influence of alcohol, entered the right hand lane from the shoulder of northbound Delaware Route 113, nearly striking Paul R. Farren's motorcyle.

8.      At the aforesaid time and place, Lynn Farren applied her brakes and steered towards the left lane of Route 113, in an effort to avoid colliding with the vehicle operated by defendant, Kathleen Pepper, causing Lynn Farren to lose control of her vehicle and strike the front passenger side of plaintiff, Helen Palko's vehicle, resulting in serious personal injuries to the plaintiff, Helen Palko.

## COUNT I
## CLAIM AGAINST KATHLEEN PEPPER

9.      Paragraphs 1 through 8 are incorporated herein by reference.

10.     The direct and proximate cause of the accident was the negligence of the defendant, Kathleen Pepper, as follows:

(a)     She operated a vehicle while under the influence of alcohol in violation of 21 Del. C. §4177(a);

(b)     She operated the vehicle in a careless and imprudent manner, without due regard for the road, weather, and traffic conditions then existing, in violation of 21 Del. C. §4176(a);

(c) She failed to give full time and attention to the operation of the vehicle, in violation of 21 Del. C. §4176(b);

(d) She drove the vehicle in a willful and wanton disregard for the safety of persons and property on said roadway, in violation of 21 <u>Del. C.</u>§4175(a);

(e) She failed to maintain a proper lookout while operating the vehicle, in violation of 12 <u>Del. C.</u> §4176(b);

(f) She failed to yield the right -of-way to vehicles approaching on the roadway while attempting to enter the roadway in violation of 21 <u>Del. C.</u> §4133;

(g) She caused a vehicle to be moved that was stopped when such movement could not be made with reasonable safety in violation of 21 <u>Del. C.</u> §4154;

(h) She failed to keep the vehicle under proper and adequate control in violation of the common law duty of care she had to others on the roadway, including the plaintiff, Helen Palko;

(i) She failed to maintain and keep a proper lookout for other persons in the area in violation of the common law duty of care she had to others on the roadway, including the plaintiff, Helen Palko;

(j) She failed to operate her vehicle as a reasonable and prudent person under the circumstances in doing the aforesaid acts set forth in sub-paragraphs (a) through (i), in violation of the common law duty of care he had to others on the roadway, including the plaintiff, Helen Palko;

(k) She was otherwise negligent.

### COUNT II
### CLAIM AGAINST GORDON PEPPER

11.    Paragraphs 1 through 10 are incorporated herein by reference.

12.    At all times relevant, the defendant, Gordon Pepper, was the owner of the vehicle being operated by the defendant, Kathleen Pepper, at the time of the accident set forth in this Complaint.

13.    At all times relevant to this litigation, Kathleen Pepper, was the agent, servant and/or employee of the defendant, Gordon Pepper.

14.    The defendant, Gordon Pepper, is vicariously liable for the acts of his agent, servant and/or employee.

15.    A proximate cause of the collision was the negligence of the defendant, Gordon Pepper, by entrusting his vehicle to Kathleen Pepper, whom he knew or should have known would act in a manner likely to cause injuries to third persons.

16.    Defendant, Gordon Pepper, by entrusting his vehicle to a person whom he knew or should have known would act in a manner likely to cause injuries to third persons, acted in a manner which constituted willful and wanton disregard for the safety of others, including the plaintiff, Helen Palko.

### CLAIM III
### PUNITIVE DAMAGES CLAIM AGAINST KATHLEEN PEPPER AND GORDON PEPPER

17.    Paragraphs 1 through 16 are incorporated herein by reference.

18.    A proximate cause of the collision was defendants' reckless indifference to the consequences and conscious disregard of the substantial risk of operating a vehicle under the influence of alcohol and consuming alcohol with prescription drugs that they knew or should have known would impair Kathleen Pepper's abilities to operate a motor vehicle, warranting punitive damages.

### COUNT ~~III~~ IV
### CLAIM OF HELEN PALKO

~~17.~~ 19. Paragraphs 1 through ~~16~~ 18 are incorporated herein by reference.

~~18.~~ 20. As a direct and proximate result of the defendants' negligence, plaintiff, Helen Palko, suffered severe personal injuries, both of a temporary and permanent nature, including but

not limited to: a fracture at the base of the third right metatarsal, deformity of the left foot, left elbow pain, right ankle pain and swelling, right knee occult fracture or severe contusion, osteonecrosis of the right knee requiring possible future surgery, left knee pain, shoulder pain, abdominal pain, hypertrophy and edema.

19. 21. As a consequence of her injuries, plaintiff, Helen Palko, has been required to undergo prolonged medical treatment.

20. 22. As a further result of the defendants' negligence, plaintiff, Helen Palko, has experienced, continues to experience and is likely to experience in the future, substantial physical pain and suffering and discomfort.

21. 23. As a further result of her injuries, plaintiff, Helen Palko, has experienced, continues to experience and is likely to experience in the future, emotional pain, suffering, anxiety, and nervousness.

22. 24. As a further result of defendants' negligence, plaintiff, Helen Palko, has incurred and may in the future continue to incur, medical bills for the treatment of the injuries sustained in the accident.

23. 25. As a further result of the defendants' negligence, plaintiff, Helen Palko, has suffered a loss of earnings and may in the future suffer a loss of earnings and an impairment of earning capacity.

WHEREFORE, plaintiff, Helen Palko, respectfully request that this Court enter judgment against the defendants, Gordon Pepper and Kathleen Pepper, jointly and severally, for compensatory, and special, and punitive damages and the costs of this action, along with any additional relief that this Court may deem proper.

DOROSHOW, PASQUALE
KRAWITZ & BHAYA


By: /s/  MATTHEW R. FOGG
ARTHUR M. KRAWITZ (I.D. 2440)
MATTHEW R. FOGG (I.D. 4254)
1202 Kirkwood Highway
Wilmington, Delaware 19805
(302) 998-0100
Attorneys for Plaintiff

DATED:  7-3-2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HELEN L. PALKO,                    )
                                   )
              Plaintiff,           )
                                   )
v.                                 )   Civil Action
                                   )   No. 06-109-KAJ
GORDON PEPPER and KATHLEEN PEPPER, )
                                   )
              Defendants.          )

     Deposition of KATHLEEN M. PEPPER, taken pursuant
to notice at the law offices of Bifferato, Gentilotti,
Biden & Balick, 1308 Delaware Avenue, Wilmington,
Delaware, beginning at 2:13 p.m., on Thursday, June 8,
2006, before Debra A. Donnelly, Registered Professional
Reporter and Notary Public.

APPEARANCES:

     MATTHEW R. FOGG, ESQUIRE
     DOROSHOW PASQUALE KRAWITZ & BHAYA
          1202 Kirkwood Highway
          Wilmington, Delaware  19805
          for Plaintiff

     DAVID A. DENHAM, ESQUIRE
     BIFFERATO GENTILOTTI BIDEN & BALICK
          1308 Delaware Avenue
          Wilmington, Delaware  19806
          for Defendants


- - - - - - - - - - - - - - - - - - - - - - - - - -
              CORBETT & WILCOX
        REGISTERED PROFESSIONAL REPORTERS
  230 N. MARKET STREET    WILMINGTON, DELAWARE  19801
              (302) 571-0510

Kathleen Pepper

1          KATHLEEN M. PEPPER,

2      having been first sworn on oath, was

3      examined and testified as follows:

4                EXAMINATION

5   BY MR. FOGG:

6      Q.   Good afternoon, Ms. Pepper.

7      A.   Hello.

8      Q.   My name is Matthew Fogg, and I represent Helen

9   Palko in this matter.

10              Ms. Pepper, I'm going to be asking you

11   several questions today.  If you don't hear or understand

12   any of my questions, please let me know, and I will be

13   more than happy to repeat it or rephrase it for you.

14              I would remind you that there is a court

15   reporter here, so I would ask that you give verbal

16   answers to all of my questions --

17      A.   Yes.

18      Q.   -- using yes or no, rather than nodding your

19   head and things like that.

20              Also, I would ask that you wait to

21   answer any questions until I finish asking the questions,

22   because the court reporter can't pick us both up talking

23   at the same time.

24              If at any time you need a break, just

## Kathleen Pepper

Page 3

1   let me know.  I'm happy to stop, and you can take a break

2   and do what you need to do, okay.

3               Ms. Pepper, could you state your full

4   name, please?

5        A.    Kathleen Marie Pepper.

6        Q.    And how old are you?

7        A.    I'm 55.

8        Q.    Where do you currently reside?

9        A.    In Selbyville, Delaware.

10       Q.    Can you give me your specific address?

11       A.    45 Clendaniel Avenue, Selbyville, Delaware

12   19975.

13       Q.    How long have you lived at that address?

14       A.    Four years.

15       Q.    Where did you live before that address?

16       A.    In Philadelphia.  That would be 3439 Sunnyside

17   Avenue, all one word, Philadelphia, PA 19129.

18       Q.    Who do you currently reside with at the

19   45 Clendaniel Avenue address?

20       A.    My husband, Gordon Pepper.

21       Q.    How long have you been married?

22       A.    Twenty-eight years.

23       Q.    Has Gordon Pepper lived with you at the

24   45 Clendaniel address for the entire period of time that

Kathleen Pepper

1    you've lived there?

2         A.    Yes.

3         Q.    So you were living at that address, the

4    Clendaniel address, on April 12th, 2004.  Is that

5    correct?

6         A.    Yes.

7         Q.    Are you presently employed?

8         A.    No.

9         Q.    When is the last time you were employed?

10        A.    February of 2002.

11        Q.    Who were you employed by at that point?

12        A.    The Salvation Army in Philadelphia.

13        Q.    Ms. Pepper, do you recall an incident that

14   occurred on Route 113 near Governor Stockley Road on

15   April 12th, 2004?

16        A.    No.

17        Q.    Are you familiar with that area?

18        A.    I drive through it.

19        Q.    Okay.  Do you know where Route 113 and

20   Governor Stockley Road intersect?

21        A.    I know I've passed it.

22        Q.    Okay.  It's near Georgetown, Delaware.  Is

23   that correct?

24        A.    Yes.  Mm-hmm.

Kathleen Pepper

Page 5

1    Q.   How close is that to your house in Selbyville?

2    A.   I'm not good at distance.  I could give you

3  time.

4    Q.   Okay.

5    A.   Maybe about a 20-minute drive.

6    Q.   On April 12th, 2004, what kind of vehicle did

7  you own?

8    A.   None.

9    Q.   You had no vehicles?

10   A.   No.

11   Q.   Did anyone in your household have a vehicle?

12   A.   Yes.

13   Q.   Who?

14   A.   My husband, Gordon Pepper.

15   Q.   What kind of vehicle did Gordon Pepper own?

16   A.   A 2002 PT Cruiser.

17   Q.   What color was it?

18   A.   Midnight blue.

19   Q.   Do you know how long Gordon had had that

20  vehicle as of that time?  Did he get it new in 2002?

21   A.   Yes.  Wait a minute.  Let me -- all right.

22  Let me get my -- let me get -- you asked me what vehicle

23  I owned in 2004?

24   Q.   Correct.

Kathleen Pepper

Page 6

```
 1          A.    And that was none.

 2          Q.    Correct.

 3          A.    When the vehicle was brand-new in 2002, I

 4     guess my -- it was in my husband's name for two years.

 5          Q.    Okay.  Did he eventually change that --

 6          A.    Yes.

 7          Q.    -- into your name?

 8          A.    Yes.

 9          Q.    Okay.  When did he change the vehicle into

10     your name?

11                Let me ask you this way.  Did he change

12     it into your name before or after April 12th, 2004?

13          A.    I'm going to say after.  I believe after.

14     Because when we purchased the vehicle, I did not have a

15     license or insurance, so we had to put it in my husband's

16     name.  I couldn't get it in my name.

17          Q.    Had you ever had a driver's license before

18     then?

19          A.    No, never.

20          Q.    When is the first time you got a driver's

21     license?

22          A.    I believe it was August of 2002, Delaware

23     license.

24          Q.    Is that the first driver's license you've ever
```

Kathleen Pepper

Page 7

1    had in your life?

2          A.    Yes.    Lived in Philadelphia.    We've got public

3    transportation.

4          Q.    I've got you.

5                      In August of 2002, did you start driving

6    at that point?

7          A.    Yes.

8          Q.    And were you driving the PT Cruiser?

9          A.    Yes.

10         Q.    Is that the only vehicle, from when your

11   husband purchased the vehicle in 2002 through April of

12   2004, is that the only vehicle you had in your household?

13         A.    I believe my husband owned at that time a, a

14   Dodge Ram truck.    We no longer own that.

15         Q.    Were you the predominant driver of the PT

16   Cruiser?

17         A.    Yes.

18         Q.    Was your husband driving the PT Cruiser at all

19   in April of 2004?

20         A.    Yes.

21         Q.    Ms. Pepper, I'm going to represent to you that

22   there is a police report from April 12th, 2004, that

23   reflects that an automobile accident occurred at

24   approximately 9 o'clock a.m. on April 12th, 2004.

Kathleen Pepper

Page 8

1                    Do you recall getting into your car that

2    morning?

3          A.    Yes.

4          Q.    Did you leave from your house or from

5    somewhere else?

6          A.    My house.

7          Q.    Do you know approximately what time you left

8    your house?

9          A.    I thought it was around 8:00, 8:15 that same

10   morning.

11         Q.    Where were you going?

12         A.    To Threshold program in Georgetown, Delaware.

13         Q.    What is the Threshold program?

14         A.    I sought alcohol counseling on my own.  I had

15   a social worker there.  It was a morning meeting.

16         Q.    What time did the meeting start?

17         A.    I believe 9 o'clock.

18         Q.    Where in Georgetown was that meeting?

19         A.    At the Threshold office.  I don't know a

20   street number.  It was right across the street from the

21   Wal-Mart.

22         Q.    Okay.  How long had you been attending that

23   program?

24         A.    I believe 2003.

Kathleen Pepper

Page 9

1        Q.    How often were you going?

2        A.    Once a week.

3        Q.    What day of the week?  Was it always one day?

4        A.    Monday.

5        Q.    Were they always 9:00 a.m. appointments?

6        A.    I know they were morning.  I don't know

7    precisely if it was 9:00.

8        Q.    How long would it normally take you to get

9    from your house to the Threshold program in Georgetown,

10   Delaware?

11       A.    I would say a half hour, 35 minutes.

12       Q.    Would you normally leave your house between

13   8:00 and 8:15 to get there?

14       A.    I believe so.

15       Q.    When you left your house the morning of

16   April 12th, 2004, was anyone at your house when you left?

17       A.    My husband.

18       Q.    Was he awake?

19       A.    I believe so.

20       Q.    What time did you wake up that morning?

21       A.    Probably about 7:30.

22       Q.    Would your husband have gotten up at the same

23   time, or was he up earlier?

24       A.    He was probably up a little earlier.

Kathleen Pepper

1      Q.    Did you talk to your husband that morning?

2      A.    Yes.

3      Q.    Do you recall what the weather was like

4   outside?

5      A.    It was, like, a misty, gray day.

6      Q.    Was it daylight outside when you left your

7   house?

8      A.    Yes.

9      Q.    Can you tell me the route that you took, that

10   you would normally take when you left your house in

11   Selbyville to go to the Threshold Program in Georgetown?

12      A.    I would take my street, Clendaniel Avenue, to

13   the corner of Clendaniel and 113, and 113 straight to the

14   Threshold program.  The Threshold program is on Route

15   113.

16      Q.    Okay.  And on your way there you would cross

17   the intersection of Governor Stockley Road.  Is that

18   correct?

19      A.    Yes.

20      Q.    Okay.  Is that the way that you would always

21   go to the Threshold program from your house?

22      A.    Yes.

23      Q.    Do you recall everywhere you went that morning

24   and afternoon before you first learned of the accident

Kathleen Pepper

Page 11

1    that occurred?

2        A.    Yes.

3        Q.    Can you tell me?

4        A.    I went to -- directly up 113 to the Threshold

5    program.  After meeting with my group and my counselor, I

6    went across 113 to the Wal-Mart market, and came home on

7    South 113 straight to 113 and Clendaniel Avenue again.

8        Q.    Did you get home that day?  You just said that

9    you went to the Wal-Mart, and then you went from the

10   Wal-Mart home?

11       A.    No, I was stopped when I left the Wal-Mart

12   market.

13       Q.    Okay.  Did you go anywhere else that day?

14       A.    No.

15       Q.    Do you recall pulling your car over to the

16   shoulder of Northbound Route 113 near the intersection of

17   Governor Stockley Road?

18       A.    I know I pulled it over on 113.  Like I say,

19   I'm not exactly sure where that Governor comes in.

20       Q.    Do you recall why you pulled over?

21       A.    I had a call on my cell phone.

22       Q.    Is that the cell phone you still have today?

23       A.    Yes.

24       Q.    Can you tell me what your cell phone number

Kathleen Pepper

Page 12

1    is, please?

2         A.   Area code (302) 841-2932.

3         Q.   Who is your provider?

4         A.   Verizon.

5         Q.   And that's the same provider and same phone

6    number that you had on April 12, 2004?

7         A.   Yes.  I checked it.

8         Q.   Do you recall who it was that was calling you

9    on the phone?

10        A.   My husband.

11        Q.   Do you recall why he called you?

12        A.   Just the weather, the way it was gray and

13   misty, just to see how I was progressing.

14        Q.   Okay.  When you normally received a phone call

15   while driving, was it your normal routine to pull the car

16   over?

17        A.   Yeah, I don't talk on the phone.

18        Q.   Do you recall about how long you were sitting

19   on the shoulder of the road?

20        A.   Less than five minutes.

21        Q.   Do you recall what the traffic was like that

22   morning on 113?

23        A.   Busier than normal.  People going to work.

24        Q.   The vehicle, the PT Cruiser that you were in

Kathleen Pepper

Page 13

1   as of April 12th, 2004, did it have both side-view

2   mirrors and a rearview mirror?

3       A.   Yes.

4       Q.   Do you recall entering the roadway after your

5   phone call on April 12th?

6       A.   I say no, because it was such an ordinary --

7   you know, I can't remember whether it was actually

8   April 12th.

9       Q.   Okay.  Do you recall anything different on

10  that morning when you pulled back into the roadway?

11      A.   No.

12      Q.   Do you recall hearing any type of screeching

13  tires, horns blowing, anything like that?

14      A.   No.

15      Q.   When you pulled into the roadway, do you

16  recall seeing any cars or motorcycles?

17      A.   A lot of cars.  I don't remember a motorcycle.

18      Q.   Did you drive through the Town of Millsboro

19  that day?

20      A.   Yes.

21      Q.   When would you have driven through Millsboro?

22  Is that on the way to the Threshold program?

23      A.   Yes.  Between Selbyville and Georgetown.

24      Q.   What other towns did you drive through on the

Kathleen Pepper

Page 14

1   way to Georgetown?  I'm not real familiar with southern

2   Delaware.

3       A.   It would be Frankford, Dagsboro, Millsboro,

4   and Georgetown.  I don't recall another town in-between.

5       Q.   Ms. Pepper, when is the first time you became

6   aware of an accident that occurred on Route 113 near

7   Governor Stockley Road at approximately 9 o'clock a.m. on

8   April 12th, 2004?

9       A.   When I was told about it.

10      Q.   Who told you?

11      A.   A State trooper.

12      Q.   And that's when you were stopped outside of

13  the Wal-Mart in Georgetown?

14      A.   Going southbound on 113.

15      Q.   Where were you headed?

16      A.   Home.

17      Q.   When the officer stopped you, can you tell me

18  what he told you?

19      A.   To leave my keys in the ignition and step out.

20  He just asked for my identification, asked me where I was

21  coming from, I believe.  Because I was so shook up.  And

22  I believe he asked me about an accident.  I wasn't aware

23  of any accident.  That's about it.

24      Q.   Did he ask you if you had consumed any

Kathleen Pepper

Page 15

1    alcohol?

2        A.    Yes.

3        Q.    Did he subsequently place you under arrest?

4        A.    After he gave me a breathalyzer.

5        Q.    He gave you a breathalyzer there?

6        A.    Yes.

7        Q.    Did he perform any field sobriety tests there?

8        A.    No.

9        Q.    He just immediately gave you a breathalyzer

10   test?

11       A.    Yes.

12       Q.    Did he tell you what the outcome of that test

13   was?

14       A.    I don't remember those words specifically, but

15   he arrested me.

16       Q.    Okay.  And where did the officer take you from

17   there?

18       A.    To the barracks.

19       Q.    Did he take you to the Beebe Hospital as well?

20       A.    Best of my recollection, we went to the

21   barracks first.

22       Q.    What did they do at the barracks?

23       A.    And he asked me to do a walking test, one foot

24   in front of the other and balance.  And I couldn't do

Corbett & Wilcox

Kathleen Pepper

1    that at any time because of the arthritis in my ankles.

2    And from there he asked me if I would submit to a blood

3    and alcohol blood test, and I said yes.  And anything

4    they asked me to do, I did.

5         Q.   And then you were taken to the Beebe Hospital?

6         A.   Yes.

7         Q.   And did they do a blood or a urine?

8         A.   Blood.

9         Q.   Do you recall the outcome of that test?

10        A.   I never pursued those results.

11        Q.   Were you subsequently charged with any crime?

12        A.   Driving under the influence.

13        Q.   And what was the outcome of that charge?  Did

14   you go to a hearing?

15        A.   Yes.  I believe it was a Justice of the Peace.

16        Q.   Do you know when you went there?

17        A.   The same day, the same afternoon.

18        Q.   Did you go to a trial, or did you enter a

19   plea?

20        A.   No, just before -- I was just before a Justice

21   of the Peace.

22        Q.   And what happened when you were before the

23   Justice of the Peace?

24        A.   I received paperwork, I believe, which stated

Kathleen Pepper

Page 17

1    that I had to go before a judge, I think it was the

2    Thursday or Friday.

3        Q.    And did you go back before a judge that

4    Thursday or Friday?

5        A.    Yes.  I sought a public defender before that.

6        Q.    Okay.  Who was your public defender?

7        A.    I don't remember the public defender's name,

8    because I never met him.  It was a gentleman that

9    interviewed me, took my information in that -- in the

10   public defender's office.  I only remember his last name

11   is Smyth because of the way it was spelled, S-M-Y-T-H.

12   And he said that the public defender would meet me at the

13   court the morning of my hearing, and he never showed.

14       Q.    Okay.  So what happened at the hearing?

15       A.    It was my very first time.  They -- someone

16   asked me if I was going to enter the first offense,

17   because it was my first offense, and I just said yes.  I

18   mean, anything they --

19       Q.    Did you plead guilty?

20       A.    Yes, I did.

21       Q.    Ms. Pepper, had you consumed any alcohol in

22   the 24-hour period before this accident?

23       A.    Yes.

24       Q.    Let's then jump back to April 11, 2004, the

Corbett & Wilcox

## Kathleen Pepper

Page 18

1   day before this accident.

2        A.   I believe it might have been Easter Sunday

3   that year.  I can't be sure.

4        Q.   I unfortunately don't know either.

5                  Is that when you started consuming

6   alcohol?

7        A.   That night, yes.

8        Q.   Do you recall about when the first alcoholic

9   beverage is that you may have consumed the night of

10  April 11th?

11       A.   What time?

12       Q.   Yes, about what time?  And if you don't know,

13  that's fine.

14       A.   We were at dinner at a neighbor's house maybe

15  around 8:00, 9 o'clock that night.

16       Q.   What are your neighbors' names?

17       A.   Barbara Hall, H-A-L-L.  And her husband is

18  Marshall Hall.

19       Q.   And they live right next-door to you?

20       A.   Yes.

21       Q.   Do you know their street number?

22       A.   I believe it's 47.

23       Q.   What did you have to drink while you were at

24  the Halls' residence?

Kathleen Pepper

Page 19

1        A.    No, I didn't drink there.  I drank when I came

2    home.

3        Q.    When you came home.  Okay.

4              Did you have any drinks when you were

5    with the Halls at dinner?

6        A.    No.  They are a nondrinking family.

7        Q.    You had dinner, you said, between 8:00 and

8    9:00?

9        A.    No, you asked what time I had my alcohol that

10   night.

11       Q.    Okay.  What time did you go to the Halls'

12   house; do you know about when?

13       A.    I don't know.

14       Q.    But you know you got back to your house

15   somewhere between 8:00 and 9:00?

16       A.    Yes.

17       Q.    And that's when you had your first drink?

18       A.    Yes.

19       Q.    What did you have to drink?

20       A.    It was whiskey and soda.

21       Q.    Was it a new bottle of whiskey; do you know?

22       A.    I don't know.

23       Q.    Do you have any idea as to when you may have

24   purchased that bottle of alcohol?

Kathleen Pepper

Page 20

1    A.    No.

2    Q.    Did you purchase any alcohol on April 11th,

3  2004?

4    A.    No.    That was a Sunday.    I don't think they

5  were open.

6    Q.    How about April 10th, 2004?

7    A.    I don't remember.

8    Q.    When you would purchase alcohol, where would

9  you purchase it from?

10    A.    There is a location on 113 called Pomeroy's.

11    Q.    When you would purchase alcohol, would you

12  generally use cash or a credit card?

13    A.    Cash.

14    Q.    Did you drink anything else that evening

15  besides whiskey and sodas?

16    A.    I don't remember.    I mean, that's the only

17  type of alcohol.    I guess you mean --

18    Q.    Yes, I just mean alcohol.

19    A.    Yes.    Yes.

20    Q.    That's the only alcoholic beverage you had,

21  was whiskey?

22    A.    Yes.

23    Q.    Whiskey and soda.

24            Do you recall about how many drinks you

Kathleen Pepper

Page 21

1    had that evening, well, from April 11th through

2    April 12th?

3         A.   No.

4         Q.   Do you recall about the last time you had a

5    drink before you got into your vehicle between 8:00 and

6    8:15 the morning of April 12th?

7         A.   It was about 4:00 or 4:30 the morning of

8    April 12th.

9         Q.   And that was another whiskey and soda?

10        A.   Yes.

11        Q.   Was anyone drinking with you?

12        A.   No.

13        Q.   Was your husband home while you were there?

14        A.   Yes.

15        Q.   Was he awake the period of time you were

16   awake?

17        A.   No.

18        Q.   Do you know about what period of time he would

19   have gone to bed on April 11th?

20        A.   Between 9:00 and 9:30 is normal time.

21        Q.   Would he normally go to bed before you?

22        A.   No.

23        Q.   Ms. Pepper, when you were getting ready to

24   leave your house on the morning of April 12th, 2004, did

Kathleen Pepper

Page 22

1   you feel that you were in a condition to drive an

2   automobile?

3        A.   Yes.

4        Q.   Was your husband aware that you had been

5   drinking the evening before and up through 4:00 to 4:30

6   on the morning of April 12th?

7        A.   I'm going to say no.  I was pretty good at

8   keeping that from him.

9        Q.   When you talked to your husband the morning of

10  April 12th, did he become aware before you left the house

11  that you had been drinking --

12       A.   No.

13       Q.   -- the evening before?

14            Did you have any conversation with him

15  about you having anything to drink the evening before?

16       A.   No.

17       Q.   And did you see him immediately before you

18  left the house?

19       A.   Yes.

20       Q.   As of April 12th, 2004, were you taking any

21  prescription medications?

22       A.   Yes.

23       Q.   Okay.  There is a pretty lengthy list

24  reflected in the police report.  I would like to walk

Kathleen Pepper

Page 23

1    through those with you.   Okay?

2         A.    Okay.

3         Q.    You can then let me know if there is any more.

4                   MR. DENHAM:  Do you recall what page

5    that's on, Matt?

6                   MR. FOGG:  I'm looking.  Page 5.

7    BY MR. FOGG:

8         Q.    The first one is Effexor, E-F-F-E-X-O-R?

9         A.    Yes.

10        Q.    What kind of medication is that?

11        A.    It's for depression.

12        Q.    Okay.  How long had you been on Effexor?

13        A.    Since I lived in Philadelphia.

14        Q.    Several years?

15        A.    Several years, yes.

16        Q.    Do you know what milligram you were taking as

17   of April of 2004?

18        A.    No.

19        Q.    Okay.  How many times a day would you take

20   that medication?

21        A.    Once.

22        Q.    When?

23        A.    In the morning.

24        Q.    Would you take it at a certain time every

Kathleen Pepper

Page 24

1    morning?

2         A.    When I get up.

3         Q.    Did you take it every single morning?

4         A.    Yes.

5         Q.    Did you take it the morning of April 12th,

6    2004?

7         A.    I'm sure I did.

8         Q.    Is there any type of warnings listed on that

9    bottle, specifically any type of warning about taking

10   that medication while consuming alcohol?

11        A.    I can't say for certain.

12        Q.    How often do you fill that prescription?

13        A.    Every -- every month.

14        Q.    When you fill that prescription every month

15   and the pharmacy gives you the warnings associated with

16   that prescription, have you ever read those warnings?

17        A.    Maybe in the very --

18              MR. DENHAM:   That's assuming warnings

19   are given.

20   BY MR. FOGG:

21        Q.    If there is a warning given, have you ever

22   read any type of warning?

23        A.    I can't say for sure.

24        Q.    Do you know the name of the doctor that

Kathleen Pepper

Page 25

1    prescribed that medication?

2        A.    I mean, in the very beginning when I started

3    to take it?  Her name was then Francine Miller.  She's

4    located in Philadelphia.

5        Q.    Who is the doctor that prescribes that

6    medication now?

7        A.    Sally Dowling, D-O-W-L-I-N-G.

8        Q.    At any point had either of those individuals

9    told you about any warnings associated with that

10   medication?

11       A.    No.

12       Q.    And those warnings would consist of taking it

13   with alcohol, whether or not the medication made you

14   drowsy, anything like that?

15       A.    Not that I recall, no.

16       Q.    How about Norvasc?

17       A.    That's blood pressure medication.

18       Q.    Do you recall the milligram of Norvasc you

19   were taking?

20       A.    No.  Just what I take now.

21       Q.    How much do you take now?

22       A.    10 milligrams.

23       Q.    Were you taking less in 2004?

24       A.    I would say yes.  I've never known it to go

Kathleen Pepper

Page 26

1    down.  It goes up.

2         Q.    How often would you take that medication?

3         A.    Once a day.

4         Q.    Did you take that the morning of April 12th,

5    2004?

6         A.    I'm sure.

7         Q.    Is that when you would always take it, in the

8    morning?

9         A.    Yes.

10         Q.    And would you also take that when you woke up

11    like the Effexor?

12         A.    Yes.

13         Q.    What doctor was prescribing that medication as

14    of April 2004?

15         A.    Again, Sally Dowling.

16         Q.    And, again, did any doctor tell you of any

17    warnings associated with that medication and mixing it

18    with alcohol?

19         A.    No.

20         Q.    And, again, did you read any type of warning

21    associated with that medication about the effects of

22    mixing that medication with alcohol?

23         A.    Not that I recall.

24         Q.    How about "Metroprol"?

Kathleen Pepper

Page 27

1    A.    Blood pressure.  Metoprolol.

2    Q.    Metoprolol, okay.

3          And how often would you take that

4    medication?

5    A.    Twice a day.

6    Q.    When would you take that?

7    A.    First in the morning, secondly at night.

8    Q.    Do you recall the milligram you were taking at

9    that point?

10   A.    No.

11   Q.    Did you take that the morning of April 12th?

12   A.    I'm sure.  Mm-hmm.

13   Q.    Who is the doctor that prescribed that

14   medication?

15   A.    Sally Dowling.

16   Q.    And, again, did Dr. Dowling ever tell you of

17   any warnings associated with that medication,

18   specifically whether it had any effects when being

19   consumed with alcohol?

20   A.    No.

21   Q.    And, again, did you read any type of warnings?

22   A.    No.

23   Q.    How about Lasix?

24   A.    That's a water pill.

Kathleen Pepper

Page 28

1    Q.   Okay.  And when did you take that medication?

2    A.   In the morning.

3    Q.   Did you take that the morning of April 12th?

4    A.   Yes.

5    Q.   Was that also prescribed by Dr. Dowling?

6    A.   Yes.

7    Q.   And, once again, did Dr. Dowling give you any

8    warnings or did you read any warnings associated with

9    that medication and its effects --

10   A.   No.

11   Q.   -- when taken with alcohol?

12   A.   No.

13   Q.   And you had a prescription Ibuprofen at that

14   time?

15   A.   Yes.

16   Q.   What was that for?

17   A.   Arthritis.

18   Q.   What milligram of Ibuprofen would you take?

19   A.   Now it's 600.  It was probably 600 milligrams

20   all along.

21   Q.   How often do you take that medication?

22   A.   Three times a day.

23   Q.   When?

24   A.   Morning, noon, and night.

Kathleen Pepper

Page 29

1      Q.   Did you take that on April 12th?

2      A.   Yes.

3      Q.   First thing in the morning with the other

4   medications?

5      A.   Yes.

6      Q.   Did Dr. Dowling prescribe that?

7      A.   Yes.

8      Q.   And, again, did you read any warnings or did

9   Dr. Dowling give you any warnings associated with that

10   medication and its effects when consumed with alcohol in

11   your system?

12      A.   No.

13      Q.   And then there is magnesium oxide and

14   potassium supplements.  Those are just vitamin supplement

15   type things?

16      A.   Yes.  I don't take them anymore.

17      Q.   You said you don't take those anymore?

18      A.   No.

19      Q.   Were they prescribed?

20      A.   Yes.

21      Q.   By Dr. Dowling?

22      A.   Yes.

23      Q.   As of April 12th, 2004, had you been taking

24   all those medications for at least a year?

Kathleen Pepper

Page 30

1        A.    I can't say quite a year, but a while.

2        Q.    Okay.  Had you ever suffered any negative

3    effects when taking any of those medications, such as

4    drowsiness?

5        A.    No.

6        Q.    Ms. Pepper, you were subsequently interviewed

7    at the Beebe Hospital by the Delaware State Police.  Is

8    that correct?

9        A.    Did you say initially?

10        Q.    Well, it just says that you were also

11    interviewed at Beebe Hospital.

12                Do you recall being interviewed at the

13    Beebe Hospital?

14        A.    No.

15        Q.    Okay.  Did you talk to more than one State

16    Trooper on April 12th?

17        A.    I don't believe so.  Just the trooper that

18    drove me there.

19        Q.    Okay.  And did he ask you a series of

20    questions, the trooper?

21        A.    At the hospital?

22        Q.    Anywhere.

23                Through the course of time you were with

24    that State trooper on April 12th, did he ask you a series

Kathleen Pepper

Page 31

1    of questions?

2        A.    No.   If he was the same trooper that pulled me

3    over, just what he asked me at the time when he pulled me

4    over.

5        Q.    Did you tell the trooper the medications that

6    you had taken that day?

7        A.    I believe he asked me.

8        Q.    With respect to all the questions the State

9    trooper asked you, did you answer all those questions

10   truthfully?

11       A.    Yes.

12       Q.    You said you had your last drink between 4:00

13   and 4:30 that morning.  What time did you go to bed that

14   morning?

15       A.    Probably about 10 o'clock that night.

16       Q.    So you didn't sleep at all April 11th through

17   April 12th?

18       A.    Mm-hmm, I believe I slept.

19       Q.    You slept?  You went to bed at 10 o'clock that

20   evening?

21       A.    Approximately.

22       Q.    And then when did you get back up?

23       A.    The reason I got back up is my husband had

24   left a space heater plugged in the night before.  I'm

Kathleen Pepper

Page 32

1    very scared of space heaters, and I woke up during the

2    night, I remembered that the heater was on, I came out

3    and I unplugged it.  And when I was going back, I

4    finished the drink that I had left there.  And that was

5    about 4:00 or 4:30 in that morning.

6         Q.   You said you had your first drink somewhere

7    between 8:00 and 9:00 p.m. that day?

8         A.   I believe so.

9         Q.   And then you said you went to bed at around

10   10 o'clock?

11        A.   About 10:00.

12        Q.   Do you recall how many drinks you consumed

13   between 8:00 and 10:00?

14        A.   No.

15        Q.   So do you have any estimate?  Was it more than

16   five?  Less than five?

17        A.   I would say five.

18        Q.   Do you recall, the bottle of whiskey that you

19   were using, was it a full bottle?

20        A.   I don't remember.

21        Q.   Do you know what kind of whiskey it was?

22        A.   I don't remember.

23        Q.   Then you went to bed at 10 o'clock, and --

24        A.   Approximately.

Kathleen Pepper

Page 33

1        Q.    Approximately 10 o'clock, and you slept up

2    until 4:00 or 4:30?

3        A.    About.

4        Q.    And then you got up at 4:00 or 4:30, consumed

5    the rest of that last drink?

6        A.    Right.

7        Q.    How much of that drink was left?

8        A.    Almost a full drink.

9        Q.    Was that the only drink that you had after you

10   woke back up?

11       A.    Yes.

12       Q.    And then did you go back to bed?

13       A.    Yes.

14       Q.    Do you know about what time you went back to

15   bed?

16       A.    4:30.  I finished the drink and I went right

17   back to bed.

18       Q.    And then what time did you wake up?

19       A.    About 7:30.

20       Q.    Mrs. Pepper, you stated that you have been

21   attending the Threshold program meetings since 2003?

22       A.    Yes.

23       Q.    How long have you had a problem with alcohol?

24       A.    My drinking really escalated around the year

Kathleen Pepper

1    2000.

2         Q.    Around April of 2004, how often were you

3    drinking alcohol?

4         A.    Daily.

5         Q.    About how many drinks would you be having on a

6    daily basis?

7         A.    I never counted.  It was ongoing.

8         Q.    Was your husband aware?

9         A.    Not really, no.  I kept it pretty well.

10        Q.    Were you just drinking whiskey and sodas?

11        A.    Or beer.

12        Q.    And would you get all of that alcohol for the

13   most part at that Pomeroy's?

14        A.    Yes.

15        Q.    When you went to the Threshold meeting, you

16   said you had a counselor there?

17        A.    Yes.

18        Q.    What was your counselor's name?

19        A.    At that time, my one-on-one counselor was Sue

20   Harris.

21        Q.    Paris or Harris?

22        A.    Harris.

23        Q.    And she is employed by Threshold?

24        A.    Yes.

Corbett & Wilcox

Kathleen Pepper

Page 35

1       Q.   Do you recall your meeting on April 12th,

2   2004?

3       A.   Yes.

4       Q.   How long were you at the meeting on that day?

5       A.   Well, we had a group meeting for one hour in

6   the morning.  That was 9:00 to 10:00.  And then a

7   one-on-one meeting with my counselor after that.

8       Q.   How long is the one-on-one meeting usually?

9       A.   Maybe a half hour.

10      Q.   Was that kind of the normal protocol?  Is that

11  how every Monday was?

12      A.   Yes.  Mm-hmm.

13      Q.   You would have a group meeting for about an

14  hour?

15      A.   Yes.

16      Q.   And then one on one for about a half an hour?

17      A.   Yes.

18      Q.   Did you tell anyone that you had been -- at

19  that AA meeting that day that you had been drinking the

20  evening before and that morning?

21      A.   Yes, my counselor knew.

22      Q.   Did you tell your counselor or did your

23  counselor ask you?

24      A.   She asked me.

Kathleen Pepper

1      Q.    And did you tell her that you had been

2    drinking and that you drank your last drink between 4:00

3    and 4:30 that morning?

4      A.    I don't recall that I told her the time.

5      Q.    When your counselor found out that you had

6    been drinking, did she perform any type of test?

7      A.    A breathalyzer test.

8      Q.    Do you recall the outcome of that test?

9      A.    I believed at that time it was .08.

10      Q.    Did your counselor express any concern --

11      A.    Yes.

12      Q.    -- for your driving?

13      A.    She told me if I -- if I had left the

14    building, that she was going to call the police.  And I

15    told her that I was going to the Wal-Mart and do my

16    grocery shopping, and then I was going straight home.

17              I just assumed all along that she was

18    the person that had turned me in.

19      Q.    So she told you that she would call the police

20    if you left the building, but you left the building

21    anyway?

22      A.    The only reason I left the building is I

23    believed I was under the limit.  I thought the limit was

24    10.  And I knew that from the advertising on TV, that

Kathleen Pepper

Page 37

1   they were talking about lowering the limit.  That's the
2   only way I knew what the limit was.
3       Q.   After the police officer told you about the
4   automobile accident that occurred on April 12th, 2004,
5   after that point did you have any recollection of any of
6   the circumstances surrounding that accident?
7       A.   No, sir.
8       Q.   Do you have any today?
9       A.   No.
10      Q.   As of April 12th, 2004, did you require any
11  corrective lenses for your vision?
12      A.   No.  I wear reading glasses.  I don't wear
13  them to drive.
14      Q.   As of April 12th, 2004, did you have any
15  problems with your hearing?
16      A.   No.
17      Q.   Prior to April 12th, 2004, had you ever been
18  arrested for driving under the influence?
19      A.   No.
20      Q.   How about since April 12th, 2004?
21      A.   No.
22      Q.   Since this accident, have you given any type
23  of recorded statement to an insurance company?
24      A.   No.

Kathleen Pepper

Page 38

1     Q.    As a result of this incident of April 12th,

2  2004, was your driver's license privileges suspended or

3  revoked?

4     A.    I would say revoked.  I lost them for a year.

5     Q.    Have you ever been involved in any motor

6  vehicle accident prior to April 12th, 2004?

7     A.    No.

8     Q.    How about any motor vehicle accidents since

9  April 12th, 2004?

10    A.    No.

11    Q.    Was it your counselor that administered the

12  breathalyzer test that morning?

13    A.    Yes, Sue Harris.

14    Q.    And when you left the Threshold program that

15  day, you felt that you were still fully capable of

16  operating a motor vehicle?

17    A.    Yes.

18              MR. FOGG:  No further questions.

19              Thank you very much, Ms. Pepper.

20              MR. DENHAM:  You have the option to read

21  the transcript of the deposition and make any corrections

22  if need be, or you can waive that right.

23              THE WITNESS:  I waive that.

24              MR. DENHAM:  Okay.  We'll waive.

Corbett & Wilcox